## Dawn M. Cardi & Associates

*Attorneys At Law*
*Two Park Avenue, 19th Floor*
*New York, NY 10016*
*212/481-7770-phone*
*212/684-3008-fax*
*917/543-9993-cell*
cardiesq@aol.com

Associate
Chad L. Edgar

Of Counsel
Jill M. Zuccardy

August 21, 2008

**BY ECF & FEDEX**

The Honorable Robert P. Patterson
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 2550
New York, New York 10007

Re:    United States v. Jackie Ray Walker, 07 Cr. 1091 (RPP)

Dear Judge Patterson:

Counsel for the defendant, Mr. Jackie Ray Walker, respectfully submit this letter on his behalf. Mr. Walker pleaded guilty to Counts One and Two of a two-count indictment on April 29, 2008. With respect to Count One, Mr. Walker was charged him with the sale of six firearms without being a licensed importer, manufacturer or dealer of firearms in violation of Title 18, United States Code, § 922(a)(1)(A). With respect to Count Two, Mr. Walker was charged with possession of firearms after being convicted of a felony related to the distribution of a controlled substance in violation of Title 18, United States Code, § 922(g)(1). Mr. Walker is scheduled to be sentenced on September 4, 2008 at 4:00 p.m.

## INTRODUCTION

In seeking a sentence of five years or 60 months for Mr. Walker, we understand that we bear a heavy burden convincing the Court that this is a reasonable sentence for a defendant whose advisory Sentencing Guidelines range is 100 to 125 months. We seek this sentence because we believe there are multiple bases for either a downward departure or variance from the range of 100 to 125 months.

First, Mr. Walker grew up in horrific circumstances caused by his mother's death at the hands of a relative when he was only six years old. That tragic event led to his removal to his aunt's home to live alongside the cousin who had caused his mother's death in a household where he and his siblings were abused and neglected. The money that the government gave to

The Honorable Robert P. Patterson
August 21, 2008
p. 2

his aunt to take care of Mr. Walker and his siblings in the form of social security was used to buy luxury items for the aunt, uncle and their children. Meanwhile, Mr. Walker and his siblings were locked out of the house during the day and on the weekends, could not help themselves to food in the refrigerator when the aunt and uncle were not home because it was padlocked, and were allotted exactly one shower per week (enforced by the removal of the faucet except for on so-called shower days). These are only a few examples of the Dickensian treatment to which the Walker children were subjected. According to the mitigation expert retained on Mr. Walker's behalf, the abuse and neglect that Mr. Walker received caused him to have a pathologically low self-esteem that, in turn, led him to want to please his siblings and loved ones at any cost. Unfortunately, Mr. Walker's siblings frequently pressed him for money – as Mr. Walker's legitimate employment was not enough to support his girlfriends, himself and his siblings, from time to time, he succumbed to the pressure to engage in illicit activity to assist his family. And that is what happened here.

Second, Mr. Walker tried to provide assistance to the government at the time of his arrest. When he was interviewed by an ATF agent and disclosed to whom he intended to sell the firearms he was transporting to New York, the agent asked Mr. Walker if he would be willing to call the purchaser and make arrangements for a controlled sale. Mr. Walker readily agreed. He made a couple of telephone calls to the purchaser and quickly agreed to accompany the ATF agent to New York in order to participate in the controlled sale unto its completion. The only reason Mr. Walker does not stand before the Court with a cooperation agreement and a 5K1.1 motion is because he was about to complete a sale with an undercover agent. The important point is that Mr. Walker stood ready to cooperate with the government and the Second Circuit has held that such a willingness can and should be taken into account in imposing a downward variance from the advisory Sentencing Guidelines range.

Third, Mr. Walker appears to be that rare person who has endured a Dickensian childhood and engaged in the rough and tumble of street hustling for which such a childhood inevitably predisposed him without losing his good heart. In our experience that is a rarity. In the report prepared by the mitigation expert, there are many descriptions of Mr. Walker's kindness as brother, friend, companion, father, and stepfather. To anyone and everyone that touched his life, Mr. Walker was always willing to give them the last shirt off of his back.

It is this quality in Mr. Walker – his good heart – that gives us hope that the Court will find a five-year sentence reasonable. And five years is a sudden escalation from the sentences that he has received in the past. The longest sentence Mr. Walker has served is less than two years. Thus, Mr. Walker has yet to demonstrate that he is that kind of defendant who no matter how severely he has been punished in the past returns to criminal conduct. Should Mr. Walker return to criminal conduct after the serious charges for which he stands accused here, then it will be time to interpose deaf ears to pleas of leniency. But we are not there yet. Therefore, we urge the Court to impose a Non-Guidelines sentence of five years.

The Honorable Robert P. Patterson
August 21, 2008
p. 3

## SENTENCING IN THE WAKE OF *BOOKER*

Section 3553 of Title 18 of the United States Code controls what factors a court is to consider when sentencing a defendant who has been convicted of a crime. In United States v. Booker, the Supreme Court held in the second of two different majority opinions that two provisions must be severed and excised from the federal sentencing statute: 18 U.S.C. § 3553(b)(1), which mandated the use of the United States Sentencing Guidelines; and 18 U.S.C. § 3742(e), which set forth the standards of review on appeal. See Booker, 125 S. Ct. 738, 764 (2005). After Booker and now Gall v. United States, the Supreme Court has made clear that the advisory United States Sentencing Guidelines have become only one of the many factors that a sentencing court must consider when imposing a sentence. See Gall v. United States, 552 U.S. __ (2007) ("The Guidelines are not the only consideration … the district judge should [] consider all of the §3553(a) factors to determine whether they support the sentence requested by a party"). Another factor that a sentencing court must consider is any relevant policy statements issued by the United States Sentencing Commission within the United States Sentencing Guidelines. See 18 U.S.C. § 3553(a)(5); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

The other factors that a sentencing court is to consider when sentencing a criminal defendant are enumerated in 18 U.S.C. § 3553(a). The statute states in pertinent part: "The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection." The purposes of sentencing set forth in paragraph (2) of the subsection and introduced by the phrase "need for the sentence imposed" are as follows:

A.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B.    to afford adequate deterrence to criminal conduct;

C.    to protect the public from further crimes of the defendant; and

D.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Other considerations the Court is to consider as enumerated under § 3553 are "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; "any pertinent policy statement issued by the Sentencing Commission …"; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and finally, "the need to provide restitution to any victim of the offense."

As a result of Booker and Gall, a sentencing court has greater discretion to consider all of the sentencing factors listed in 18 U.S.C. § 3553 rather than relying strictly on the United States Sentencing Guidelines. United States v. Crosby, 397 F.3d 103 (2d Cir. 2005); see also Gall, 552 U.S. __ (2007).

The Honorable Robert P. Patterson
August 21, 2008
p. 4

**ARGUMENT**

I.    **The Nature and Circumstances of the Offense**
      **And the History and Characteristics of Mr. Walker**

    A.    **The Nature and Circumstances of the Offense**

Mr. Walker sold or attempted to sell a total of eleven firearms to an undercover officer operating in the Bronx, New York between April 5, 2007 and August 1, 2007. See Presentence Investigation Report prepared on June 19, 2008 (hereafter "PSR"), ¶¶ 8-13. Mr. Walker drove up from Georgia to sell two guns to the undercover officer on April 5, 2007; four more guns on July 13, 2007; and attempted to sell five more guns on the day of his arrest on August 1, 2007. See id.

As can be seen from his criminal history, Mr. Walker is not a professional gun trafficker as this is his first firearm possession and/or trafficking conviction. See PSR, ¶¶ 37-60. At the time that Mr. Walker engaged in the instant offense conduct, he was under tremendous financial strain. His siblings were asking him for money; he was supporting his own two children and their mothers; he was supporting his live-in companion and her daughter by another man; and he had been recently arrested for drug trafficking because he was in the wrong place at the wrong time. Mr. Walker felt the pressure to obtain money; he therefore resorted to illegitimate means – the sale of firearms.

On the day of his arrest, Mr. Walker was stopped by local sheriffs in North Carolina who noticed that he was weaving in and out of lanes on Interstate-95. When they found firearms in Mr. Walker's car, the sheriffs notified the local ATF office. Subsequently, Special Agent Woody Avant (hereafter SA Avant) of ATF took over the interrogation of Mr. Walker. During the course of this interrogation, SA Avant asked Mr. Walker if he would be willing to participate in a consensually recorded conversation with the intended purchaser of the five guns that he was transporting to New York. Mr. Walker readily complied and made a few telephone calls to the purchaser in order to set up a meeting the next day. After the meeting was set up, SA Avant asked Mr. Walker if he would be willing to travel to New York with SA Avant in order to participate in a controlled sale of the five firearms. Again, Mr. Walker readily agreed. The plan to use Mr. Walker in a controlled sale ended abruptly upon SA Avant's learning that the purchaser of the guns was actually an undercover federal agent.

    B.    **Characteristics of the Defendant**

It is an understatement to state that Mr. Walker has had a hard-luck life. He lost his mother at an impressionable age. He and his siblings found themselves thereafter in a Brothers Grimm fairy tale when they became the adopted children of an aunt who took money that was theirs in the form of governmental support and gave it to her own children. With no love and support from his surrogate parents who could have encouraged him to pursue legitimate activities like academics (apparently, Mr. Walker was in the top 90% of his class before his

The Honorable Robert P. Patterson
August 21, 2008
p. 5

mother died according to standardized intelligence tests) and athletics (apparently, college football scouts were interested in Mr. Walker), Mr. Walker was easy prey for neighborhood dealers who persuaded him to be their lookout with the pitiful offering of a pair of sneakers and subsequently, a bike. In light of his history, it is little wonder that Mr. Walker turned to criminal activity as a means of escaping his Dickensian childhood. What is cause for wonder is Mr. Walker's humanity and dignity that he has kept intact in spite of his past. The mitigation report prepared on Mr. Walker's behalf is replete with accounts of his generosity to his sisters and brother, ex-girlfriends and present girlfriend and his and their children. A copy of that report (hereafter "the Report") is annexed hereto as Exhibit "A". It is also replete with accounts of his attempts to lead a law-abiding life and the unfortunate undermining of those attempts by his family who are all too willing to exploit Mr. Walker's willingness to sacrifice his own good for theirs by pressuring him to provide money knowing full well that his only means of obtaining the kind of money they sought would have to come from illicit activity.

A summary of Mr. Walker's life as presented in the mitigation report follows.

The key moment in Mr. Walker's life was the loss of his mother when he was only six years old. Apparently, Mr. Walker was especially close to his mother as he was the baby of the family. See the Report at 5. On the day of her death, Mr. Walker's mother was doing an odd job with her two nephews. One of the nephews accused Mr. Walker's mother of taking money that was due to him – he ended up pushing her down and a tumor that she had in her brain ruptured. See id. Not only did Mr. Walker and his siblings have to deal with the trauma of the loss of their mother, they had to deal with the fact that they were immediately adopted by the mother of these nephews and would have to figure out a way of living alongside the person that they believed murdered their mother. To make this whole scenario straight out of a Dickens novel or Brothers Grimm fairy tale, the children were subjected to a constant and grinding abuse at the hands of their new parents while they saw their cousins treated like kings with the money that was rightly theirs. See id. at 5-6.

By way of examples as to the kind of abuse to which Mr. Walker and his siblings were subjected, we note that the electricity was turned off at the house where they lived with their aunt and her family while the adults – including her much older children – were at work during the day. See id. at 6. Also, the aunt placed a lock on the refrigerator so Mr. Walker and his siblings could not snack on food during the day (for example, when they got home from school). See id. Also, Mr. Walker and his siblings were allowed to shower only once per week. See id. To enforce this policy, the aunt removed the faucet so that water could not be turned on. See id. And lastly, Mr. Walker and his siblings never received new clothes – all the clothes that they wore were from the Salvation Army. See id.

As is usual for someone as young as Mr. Walker who endured especially oppressive childhood circumstances, he had fantasies of being rescued from his "evil stepmother." The only candidate for the proverbial knight in shining armor was his father. His father, however, hardly qualified. According to family lore, his father had beaten his mother so frequently and severely that he was the cause of her brain tumor. See id. at 4. Further, Mr. Walker was led to believe

The Honorable Robert P. Patterson
August 21, 2008
p. 6

that his father got into an argument with another man and was compelled to leave the area.  See id.  When his father re-entered his life a few years after his mother died, Mr. Walker had hope that his father would rescue him – on a visit to Georgia, Mr. Walker's father did suggest that he was going to seek to gain custody of his children.  See id. at 8.  It appeared that Mr. Walker's fantasy of being saved from his oppressive circumstances were finally panning out.  Unfortunately, Mr. Walker's father was unable to follow through on his promise.  Not only did he not seek to gain custody of his children, when he did send the children presents – new pairs of sneakers – he did not send anything to Mr. Walker (according to his sister it was because he did not know his shoe size).  See id.  It does not take a psychologist to appreciate how severe the blow to Mr. Walker's esteem must have been this broken promise of a rescue from his miserable circumstances.  Mr. Walker must have felt as worthless as the treatment by his aunt implied.

The miracle is that out of these circumstances Mr. Walker did not turn into a monster.  The mitigation report is full of accounts of his good nature.  When he received food from a kind neighbor who witnessed the neglect of Mr. Walker and his siblings and took pity on him by giving him a snack after school, Mr. Walker always remembered to bring food home for his siblings.  See id. at 10.  When Mr. Walker started working as an assistant to the school janitor, he shared his scant wages with his siblings so they could buy lunch at school.  See id. at 13.  When he began hustling with the dealers in his neighborhood, he would share these proceeds with his siblings.  See id. at 11.

In his romantic relationships, Mr. Walker has demonstrated a similar generosity.  The mother of one of his children, Ms. Myra Wright, describes Mr. Walker as the most "supportive partner" she could have found and the only criticism she had of him was that he was overly devoted to his siblings.  See id. at 17.  This same criticism was the only fault that the mother of his other child could identify.  According to Ms. Gloria Washington, Mr. Walker was generous to a fault and nothing but a kind and a good father figure to his child and her child by a different father.  See id. at 18.  Mr. Walker is presently involved with Ms. Dwayna Benning.  Ms. Benning appears to recognize some of the patterns that have sabotaged Mr. Walker's prior relationships – especially the friction associated with competition for attention between Mr. Walker's siblings and his girlfriends – and is willing to address the underlying issues that drive these patterns.  See id. at 18-19.  She also seems to be one of the few people in Mr. Walker's life who does things for him rather than merely expecting him to do things for her.  For example, she purchased Mr. Walker a new pair of sneakers because his wardrobe consists of six outfits and one pair of shoes.  As indication of Mr. Walker's sense of himself and the kind of unhealthy relationships he has fostered with others, Mr. Walker's response to the gesture was "Why did you waste money on me?"  Report at 18.  We have every belief that Mr. Walker has finally found someone in Ms. Benning who has the patience to encourage him to break the pattern of abusive relationships with others, especially his siblings, relationships that in the past have led him to engage in the kind of self-destructive conduct at issue here.  Mr. Walker's good nature ensures that his path towards rehabilitation is more than possible.

The Honorable Robert P. Patterson
August 21, 2008
p. 7

## II.    The Need for the Sentence Imposed

### A.    To Reflect the Seriousness of the Offense, to Promote Respect For the Law, and to Provide Just Punishment for the Offense

On behalf of Mr. Walker, we request that the Court impose a sentence of five years for his violations of the statutes regarding gun-trafficking and felon in possession of firearms. We understand that Mr. Walker's violations are serious – the danger to the public that trafficking in firearms poses is real and substantial. Mr. Walker, however, is not a professional gun-trafficker so the need to remove a substantial player in the gun-trafficking trade for a considerable length of time is inapplicable here. Further, a careful reading of Mr. Walker's criminal history reveals that, unlike the typical gun trafficker, he has never engaged in violent activity.

We would also note that, if this were Mr. Walker's first offense, which it is in the sense of it being his first gun-trafficking offense, his advisory Sentencing Guidelines range would be only 70-87 months (assuming a Criminal History Category of I). In light of the applicable mitigating factors that we discuss below, the sentence that we seek – 60 months – is within the range of 70-87 months that the Sentencing Guidelines recommend for the gun-trafficking activity to which Mr. Walker pled, if he were a first time offender.

### B.    To Afford Adequate Deterrence to Criminal Conduct

18 U.S.C. §3553(a)(2)(B) instructs the Court to consider whether the sentence recommended by the Guidelines provides adequate deterrence to criminal conduct. Reason dictates that a term of imprisonment provides general deterrence; but 18 U.S.C. §3553(a) also instructs that a sentence should not be "greater than necessary." (Stating that a sentence may not be greater than necessary to comply with the purposes of punishment.)

It is well settled that a sentencing court should look at the previous sentences imposed on a defendant to see whether he or she has received a long sentence and nonetheless returned to criminal conduct. For example, the court in United States v. Mishoe analyzed a request for a horizontal departure in light of a court's obvious concern for recidivism. There, the court noted that a sudden escalation in the length of a sentence is only warranted where a defendant has received two substantial sentences – using the example of five or six year sentences – and returned to criminal conduct. See Mishoe, 241 F.3d 214, 220 (2d Cir. 2001) In such circumstances, the imposition of a sentence of fifteen to twenty years is warranted according to the Mishoe court. See id. The principle behind Mishoe is that a defendant's disposition to recidivate should be viewed in light of his or her behavior after a significant sentence of five or six years. Should the defendant fail to learn his or her lesson, it is time then to impose a lengthy sentence to deter future criminal conduct.

Here, in spite of Mr. Walker's lengthy criminal history, the vast majority of his convictions have been for misdemeanors or lesser felonies. See PSR, ¶¶ 37-58. Notably, he has only one conviction for possession of a controlled substance with intent to distribute. See PSR,

The Honorable Robert P. Patterson
August 21, 2008
p. 8

¶ 45-6.  For that offense, Mr. Walker received a sentence of 12 years but actually served less than two years because it did not involve a violent component.  Thus, Mr. Walker has yet to receive a significant sentence from which the court can evaluate whether an even more significant sentence is required to deter subsequent recidivism.  While we do not suggest that Mr. Walker should be allotted many bites of the apple, the sentence of five years that we seek here is significant, in fact, more significant than Mr. Walker has yet received, and it will be the first real test of his ability to change course and lead a law-abiding life.  Should he return to criminal conduct after receiving a five-year sentence for his gun-trafficking violation, then it will be time to recognize that Mr. Walker needs the jolt of a considerably lengthier sentence than he has received before to deter him from future criminal conduct.

###    C.    <u>To Protect the Public from Further Crimes of the Defendant</u>

Section 3553(a)(2)(C) requires the Court to consider the need to protect the public from future crimes of a particular defendant, in this case Mr. Walker.  The United States Sentencing Commission (the "Commission") released a report in May, 2004 that issued statistical data regarding the likelihood of defendants' recidivism based upon a variety of demographic information.  <u>See</u> <u>Measuring Recidivism</u>, annexed hereto as Exhibit "B".

The Commission's study on recidivism demonstrates that the probability of a criminal defendant re-offending upon release decreases as he ages.  <u>See id.</u>  By way of example, if a defendant is between the ages of 21 and 25 at the time of his sentencing, his probability of re-offending is about 32%.  If a defendant like Mr. Walker is between the ages of 31 and 35 at the time of his sentencing, the probability that he will re-offend decreases to about 24% - an approximately 25% decrease in the recidivism rate.  The statistics here bear out what appeals to common sense – criminal activity is a young person's activity that is abandoned as defendants grow older and develop impulse control.

The Commission's study on recidivism also demonstrates that a history of employment and being in a relationship that resembles marriage appear to decrease the likelihood of re-offending.  <u>See id.</u>  The statistics surrounding these factors also appeals to common sense – if defendants have the kind of skills and work ethic to maintain employment and a family to support, they are less likely to turn to any illicit activity that might jeopardize their stable situation.  Here, as the mitigation report indicates, Mr. Walker has worked legitimate jobs all of his life.  <u>See</u> Report at 13-14.  Also, he has been in a stable relationship with Ms. Benning for the past three years, cohabitating with her daughter and herself and living as a mutually supportive and loving family.  <u>See id.</u> at 18.  At the time of his latest arrest, Mr. Walker was making decent money as an electrician and happily assuming the role of husband to Ms. Benning and father to her daughter.  Mr. Walker is in terrible distress that he faces such a long separation from Ms. Benning and her daughter and from the other members of his family, especially his two children.  We believe that Mr. Walker will be loathe to do anything in the future that might again separate him from Ms. Benning, her child and with his own children.  Further, his current regret for his self-destructive actions will be coupled with a newly found recognition of his pathological desire to please others at the expense of his own welfare and liberty, obtained with the assistance of the

The Honorable Robert P. Patterson
August 21, 2008
p. 9

mitigation expert. Now that he recognizes the impulses that are behind his poor decision-making, we believe he will be able to control those impulses and lead a law-abiding life.

## III.    The Sentencing Guidelines Considered

### A.    The Sentencing Guidelines As Calculated By Probation

According to the Probation Office (hereafter the "Office" or "Probation"), Mr. Walker's base offense level is 20. See PSR, ¶ 23. There is an enhancement of four levels to that offense level because Mr. Walker's offense conduct involved eleven firearms, according to Probation. See PSR, ¶ 24. Probation adds another two-level enhancement because Mr. Walker trafficked in stolen firearms. See PSR, ¶ 25. Finally, Probation adds a four-level enhancement because Mr. Walker engaged in the trafficking of firearms. See PSR, ¶ 26. Adding all of these enhancements, Probation calculates an adjusted offense level of 30. For accepting responsibility for his conduct and not forcing the government to go to trial, Mr. Walker receives a three-level decrease to his offense level. See PSR, ¶ 31. Mr. Walker is then found to be in Criminal History Category IV. See PSR, ¶ 51. With an offense level of 27 and Criminal History Category of IV, Mr. Walker's advisory Sentencing Guidelines range is 100 to 125 months.

### B.    Mr. Walker's Childhood Warrants The Imposition
###       Of A Downward Departure Or A Downward Variance
###       From the Advisory Sentencing Guidelines

In light of the abuse that Mr. Walker suffered as a child, the pathology that it caused by rendering him susceptible to the pleas of his siblings and loved ones to support them by engaging in criminal conduct, and the link between this pathology and the instant offense, we submit that a downward departure based on childhood neglect is warranted here.

In the Second Circuit, a downward departure may be granted on the basis of childhood abuse. See United States v. Brady, No. 02 Cr. 1043, 2004 WL 86414, at *7 (E.D.N.Y. Jan. 20, 2004). In granting such a downward departure, a sentencing court must find that the childhood abuse was extraordinary and that it is somehow related to the instant conduct. See id.

The abuse that Mr. Walker endured was extraordinary. Putting aside the fact that Mr. Walker endured the loss of his mother at a vulnerable age, that her death was at the hands of his cousin with whom he was forced to live directly thereafter, Mr. Walker's abuse can be traced to the fact that he lacked basic necessities during his childhood. While staying with his aunt, he and his siblings had no access to the amenities of shelter or food after school while they awaited the return of their aunt and uncle from work. See Report at 6. Also, on weekends, they were not allowed into the house when the aunt and uncle were partying into the wee hours of the morning. See id. The only food that they received at times was the sporadic generosity of neighbors who witnessed their abuse. See id. at 10. Mr. Walker and his siblings also lacked basic medical attention. Because Mr. Walker was only allowed one shower per week, he suffered from repeated infections, rashes and skin fungi. See id. at 6 & 15. When a splinter lodged in his

The Honorable Robert P. Patterson
August 21, 2008
p. 10

thumb, his aunt took him to a doctor only when prompted to do so by a neighbor who saw how it had caused an infection. See id. at 15. Eventually, the splinter was surgically removed. See id. Apparently, Mr. Walker was so poorly clothed that he would have to spend months walking around without shoes, during which times he would get all sorts of cuts and scrapes that would become infected. See id. This extreme neglect in terms of the basic necessities was against the backdrop of constant domestic turmoil between his aunt and uncle who drank frequently and fought between themselves. See id. at 6. Further, his aunt constantly told Mr. Walker and his siblings that they would not amount to anything. See id. at 11. We believe that Mr. Walker's childhood circumstances amount to the extraordinary kind of neglect recognized by the Second Circuit as a basis for a downward departure.

According to Mr. Walker's mitigation expert, the abuse that he suffered led to his radical lack of self-worth, which, in turn, is most tangibly expressed by his compulsive need to please others, especially his siblings. See Report at 22 ("Of note, for instance, is Jackie's compulsive obligation to his siblings that presses him to put his own interest and needs at risk for the financial benefit of his siblings"). By way of example, the mitigation expert relates that Mr. Walker chastised his current girlfriend for buying him a new pair of sneakers because he thought any expenditures on himself was a waste of money. See id. at 18. Notably, Mr. Walker's past relationships ended because his girlfriends realized that they would never receive the kind of attention that Mr. Walker lavished upon his siblings. See id. at 17-19. Thus, Mr. Walker's drive to please his siblings is pathological to the extent that it repeatedly frustrated his ability to establish and maintain a healthy intimacy with companions.

As for the relationship between Mr. Walker's pathology associated with his childhood abuse and the instant offense, we note that his sale of firearms was against the backdrop of the incessant financial pressures associated with his siblings and loved ones. Mr. Walker's pathological desire to please others appears always to win out over any desire he may have to preserve his own welfare and liberty. That is the story of Mr. Walker's life – a story that we believe Mr. Walker is in the process of rewriting as he reflects upon it in preparation for his sentencing.

Alternatively, we submit that the kind of childhood circumstances that Mr. Walker endured supports our request for a downward variance from the advisory Sentencing Guidelines range of 100 to 125 months. While we agree that socio-economic deprivation and absent or poor role models are seldom an excuse for a defendant's turn to the kind of illicit conduct attributed to Mr. Walker, the deprivation and abuse that he endured was extraordinary. Therefore, his turn to illicit conduct was almost inevitable. What is surprising and deeply impressive about Mr. Walker is the kindness, dignity and humanity he has been able to maintain in the face of so much adversity. His ability to preserve a good nature and generosity towards others and his dogged pursuit of legitimate employment throughout his adult life suggests that he will know how to make use of a second chance to turn his life around. Further, he has the benefit of a loving and kind companion in Ms. Dwayna Benning who is determined to support him upon his release from prison.

The Honorable Robert P. Patterson
August 21, 2008
p. 11

Whether based on a downward departure or a variance from the advisory Sentencing Guidelines, we submit that a sentence of 60 months or five years is reasonable for Mr. Walker in light of his harrowing childhood experiences.

### IV.    Mr. Walker's Post-Arrest Attempt To Cooperate Provides An Additional Basis For Imposing A Non-Guideline Sentence of Five Years

As described above, see Part I.A., Mr. Walker readily agreed to cooperate with the ATF agent who interviewed him shortly after his traffic stop and arrest in North Carolina. At the prompting of the agent, Mr. Walker made a couple of telephone calls with the intended purchaser of the firearms he was transporting from Georgia to New York. Mr. Walker also agreed to accompany the ATF agent to New York in order to participate in a controlled sale of the firearms to the intended purchaser. Further, during the course of the interviews with the ATF agent, Mr. Walker disclosed most of his instant offense conduct. Ultimately, Mr. Walker was unable to provide substantial assistance to the government because the intended purchaser of the firearms turned out to be an undercover officer. Therefore, Mr. Walker's unhesitating willingness to cooperate with the government does not warrant the kind of downward departure usually associated with cooperation and 5K1.1 motions.

The Second Circuit has recognized that sentencing courts may take into consideration a defendant's willingness to cooperate even if it does not amount to substantial assistance when considering "the history and characteristics of the defendant." See United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006). Here, Mr. Walker's willingness to assist the government immediately after his own apprehension suggests a person who readily assumes responsibility for his actions. It also suggests a person who is hardly the hardened criminal that his Criminal History Category of IV might otherwise suggest. Had Mr. Walker's purchaser not been a law enforcement agent, he would have stood before this Court with the realistic prospect of receiving a sentence of a year or two as a defendant who provided substantial assistance. The fact that he stands before this Court with the prospect of receiving a much longer sentence than a year or two stems not from anything to do with his characteristics, criminal history or offense conduct but the bad luck of being in a transaction with a government agent against whom he can provide no assistance. Thus, we submit that a reasonable sentence here in light of Mr. Walker's ready willingness to help the government is 60 months or five years.

The Honorable Robert P. Patterson
August 21, 2008
p. 12

## **CONCLUSION**

For all the reasons stated above, we respectfully submit that a reasonable sentence to impose on Mr. Walker is 60 months or five years. Further, we respectfully request that the Court recommend that Mr. Walker be designated by the Bureau of Prison to a facility near his family, most of whom reside in the Augusta, Georgia area.

Respectfully submitted,

*Dawn M. Cardi*

Dawn M. Cardi

Encls.

cc:    Adam S. Hickey (by ECF & email w/encls.)
       Assistant United States Attorney

       Stephanie M. Dunne (by email w/encls.)
       U.S. Probation Officer

       Jackie Ray Walker (by mail w/encls.)

# EXHIBIT A



*CVA Consulting Services, Inc.*

August 18, 2008

Honorable Robert P. Patterson, Jr.
United States District Judge
Southern District of New York
500 Pearl Street
Room 2550, New York, NY 10007

Re:    <u>U.S. vs. Jackie Ray Walker</u>
             07 Cr. 1091 (RPP)

Dear Judge Patterson:

      Upon the request of counsel, Dawn Cardi, Esq., the following is a presentence report prepared on behalf of her client, Jackie Walker.   This report is intended to supplement the report that has been submitted by the Office of Probation.   In preparing this report the following was done:

    a)     Interview with the following persons:

- Jackie Walker
- Ronald Walker, brother
- Alicia Walker, sister
- Florence Bradley, aunt
- Daisy Walker, aunt
- Dwayna Benning, fiancé
- Junett Lampkins, neighbor

1

PRE-SENTENCING REPORT
WALKER, Jackie Ray

- Gloria Washington, child's mother
- Jaquinta Collins, godmother

b)    Review of the following Documents:
- Elementary and High School records from Richmond County School Augusta, Georgia
- Criminal History records
- Medical records from Prison Health Services, Georgia Department of Corrections
- Social Security Statement of Earnings
- Medical records from University Hospital, Augusta, Georgia
- Work Performance Rating –Inmate, dated 7/8/08
- Pre-Trial Inmate Review Report, dated 7/10/2008
- United States Government Memorandum dated, 7/30/08
- Probation Report, United States District Court, dated June 24, 2008
- Federal Bureau of Prison records

## Introduction

Jackie Walker is a 31 year old African American male currently incarcerated at the Metropolitan Correctional Center in New York City where he awaits sentencing. On April 29, 2008 Jackie pled guilty to Firearms Trafficking, a Class D Felony, and Felon in Possession of a Firearm, a Class C felony.    In the interviews conducted with Jackie he has expressed deep remorse over his actions, and indicated that, upon reflection, he is happy the guns that he sold ended up in the hands of the authorities rather than on the streets. He laments the choices that he made which led him to come face to face with the criminal justice system, and, while not making excuses for his conduct, he wonders what life would have been like for him had his mother not died when he was six years old.

2

PRE-SENTENCING REPORT
WALKER, Jackie Ray

## Social History

Jackie Ray Walker was born on December 5, 1976 in Augusta, Georgia. He is the last of four children born to the union of Gussie Belle Walker and Ronald Sidney Walker. His siblings in birth order are Alicia Walker, Vivian Walker, and Ronald Walker II. All three siblings continue to reside in Augusta., Georgia. Both parents are deceased and, as such, information obtained about them is limited. A brief history is offered of the parents.

Gussie Belle Walker was only 36 years old when she died on June 25, 1983. She was born on May 29, 1949, the last of nine children born to her parents, Mary and Jack Lawrence. Of the nine children only two are still living. According to Florence Bradley, an older sister of Gussie's, and the aunt who had custody of Gussie's children after she passed, Gussie was a nurse at the University Hospital in Augusta, Georgia. After Gussie developed a brain tumor she stopped working at the hospital. She got a job at the Harlem Motor Lodge, where Florence was employed. From the information obtained, Gussie was a kind, Christian woman, who lived for her children.

According to Jackie, and confirmed by his brother, Ronald Jr.,(hereafter "Ronald"), their father, Ronald Walker, Sr. was a military man. Their paternal grandfather was a lightweight champion who went by the moniker, 'Bo-Jack Shoeshine.' Bo-Jack, in an effort to capitalize on and market his boxing skills, relocated to New York with his family. At the time that 'Bo-Jack' moved to New York, Ronald Sr. was still very young. After high school, Ronald Sr. enlisted in the military. It was while he was stationed in Georgia that he met and married Gussie Belle, who was younger than he. According to family members, Ronald Sr. was shot while in combat in Vietnam and received disability as a war veteran.

In an interview with Florence, she recalled that there was domestic violence in Jackie's home and that he and his siblings were exposed to it. According to her, Ronald

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

Sr. just walked away from his wife and children, and "went back to New York to his folks." Jackie has no memory of when his father was in the home, and neither does he recall the abuse, but he had heard that is mother had a brain tumor which was attributed to blows to her head that were inflicted by her husband.    In interviews with both Florence Bradley, and Jackie's oldest sibling, Alicia, it was confirmed that it was the accepted opinion that it was the blows to her head that resulted in the tumor.  While there was no medical evidence offered so support this opinion, it is a belief that shaped Jackie's memories of his father.    There is also a difference of opinion as to why Ronald Sr. left Georgia.  Jackie learned that his father had gotten into a dispute with another man and this led to his father leaving Georgia.   However, both Ronald and Alicia confirm that there was continuous communication between Gussie and her husband up until the time of her death.

Alicia recalled the disputes that her parents engaged in, but remarked that this was overshadowed by the love and support that her parents provided for them.  She was ten years old when her father left the home, and so her memory of the times that they lived together as a family is sound.  "We had a good life," she recalled, and said that when her father was around, they were taken on family trips, and were given every amenity that a child could ask for.   Alicia remarked that after her father left, her mother worked two jobs and took on side jobs in order to earn additional income, so that they could still enjoy a comfortable lifestyle.   This unfortunately led to her death.   It was recalled that she took a job to paint a house and she got her nephews, Thomas and Michael Bradley, to assist her.  Upon completion of the job, there was a dispute with Thomas over how the money should be divided.   Alicia was 12 years old at the time and remarked that the man who hired them to do the work had paid Michael, but Thomas thought that Jackie's mother had the money and an argument ensued.  Thomas pushed Gussie Belle and she fell and hit her head on a stone, causing the tumor in her head to rupture.   As Alicia recounted the death of her mother she sobbed uncontrollably.

4

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

Thomas was 16 years old at the time that he pushed Gussie Belle to her death and, though he was initially arrested and spent a few days in juvenile detention, the death was ruled an accident and so no criminal charges were filed. It is a day that Jackie said he will never forget. He recalled that as the 'baby' his mother tended to take him with her whenever she went out; however, on that day his mother did not take him. "I was crying because I did not want her to go," he remarked. He felt that if he had gone with her she would not have argued with Thomas. "She would never argue with me there."

At the time of her death, Gussie was living in a double wide trailer home, about 20 miles outside of Augusta, with her four children. The main concern for the family after her death was who should have custody of the children. According to Florence Bradley, Thomas's mother, she tried to locate Ronald Sr. but to no avail. However that position is strongly disputed by Alicia who vividly recalls how she and her siblings ended up with Florence. "There was no court hearing or anything like that. My mother was buried on Sunday July 3rd, Monday was a holiday and on Tuesday she came with the papers." Alicia said she will never forget her aunt's words as she came to claim them. "I have good news and bad news," Florence proclaimed. "The good news is that I have custody of y'all, and the bad news is that you'll have to stay with me till you're 18."

Those words were the precursor to what turned out to be a hellish life for Gussie Belle's children. While thankful that they were not separated, it was difficult for them to be in the home of the person they deemed responsible for their mother's death. There was no counseling provided and no mention of Gussie's death was allowed in the home. "It was like after she died it was to be forgotten and not mentioned again." Ronald remarked. Compounding that was the fact that for the entire time that they lived with Florence and her husband, their lives were marked by deprivation and abuse of the worst kind.

According to Ronald, and confirmed by Alicia, it appeared that the only reason Aunt Florence took custody of the children was the money she was getting for them.

5

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

There were Social Security benefits for all four children as well as life insurance benefits that Gussie got from her job. According to Jackie, his aunt received $450.00 per month for each child. Jackie, Ronald and Alicia stated that Florence enriched herself and her family rather than see to the needs of the Walker children. "They changed their car every year with the money they got for us," Alicia remarked.

According to Ronald, he and his siblings never had enough clothes and there was never enough food for them even though Aunt Florence, her husband and her sons had plenty. Their aunt kept a breaker in her room, and she would turn the electricity off when she was away from home. Jackie still remembers the lock that was placed on the refrigerator, and the pangs of hunger that were his constant companions. The faucet was removed so they could only have showers once per week. As a result of poor hygiene he suffered from a variety of infections. The clothes that he wore were obtained from the Salvation Army. Alicia recalled the words her uncle told her when she asked them for money to get clothes. He said, "Gal, the state send that money to Florence for a place for you all to stay, food, light and water. There is no money for clothes and accessories."

However, not even food was sufficiently provided. Jackie recalled the regular visits they would make to the food kitchen in order to get something to eat. Jackie recalled that there was no such thing as breakfast for them in the mornings before school. He recalled that it was the janitor and the school helper who would leave a plate of food for him. In return for the food, Jackie said, he would assist the school's janitor and helper with throwing out the garbage.

Accompanying the abuse and deprivation was the disorderly atmosphere of the home. Florence and her husband had frequent fights and arguments. Additionally, there was drinking and carousing that took place either at home or elsewhere. Ronald recalled that it was particularly tough on the weekends, when their aunt and uncle were out. "The weekends were the worst," Alicia stated. Jackie explained that he and his siblings had to wait until the wee hours to be let into the house, because they were not allowed in the

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

home when there was no one else there.   He recalled the horror of seeing Ronald fall on
the spike of the fence as he tried to climb over the fence.   The spike tore through
Ronald's leg, which required medical treatment.

According to Ronald, his aunt was a mean person by nature.   He recalled that they
did not have to do anything wrong to be cursed at.   "We were called little mother fuckers,
bastards, son of a bitch, all the time."   They were constantly told that they would amount
to nothing.   "It seemed like they wanted us to be poorer than their kids.   They made it
difficult for us to do well in school, even denying us space to do our work."   Ronald
recalled that they were prevented from going on field trips and there was never enough
money to support extra curricular activities.   Jackie was only six years old and could not
understand why they were treated with so much hate.   He remembered his mother telling
them that they would "catch hell" after she passed away.   Ronald recalled that from the
time he was 11 years old he had to worry about things that a child shouldn't have to.
"We had to figure out how we'd eat, get clothes; we were living the life of a grown up in
a child's body."

Alicia confirmed the vindictiveness of the treatment towards them and wondered
if it was done out of jealousy because her mother was in a better financial situation than
the rest of her siblings, and was able to provide a "very good" life for her children.   Alicia
even recalled that at one time, her mother had Michael Bradley living with them.   She
recalled that prior to her mother's death both Florence and her husband treated them with
kindness, so it was a shock to them that they were treated so poorly.   "No child should
have to go through what we went through.   We never did her anything but she treated us
like animals."   Daisy Walker, an aunt confirmed that Florence treated the children
poorly.   Daisy, who has a son of her own, remarked that she would hate for her child to
be treated the way that Florence treated Gussie's children.   "After their mama died they
came up real rough," she remarked.   "She [Florence] cussed them and treated them bad.
I'll not lie for her.   God don't like bad," Daisy said, adding that she tried to do for them
when she could but it was Florence who had custody.

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

A couple years after Gussie died, Alicia received a telephone call from their father, Ronald Sr.  It was revealed to Jackie later that Ronald Sr. had been in jail for assaulting a police officer and was unaware that his wife had died.  Upon his release he went to reinstate his military checks and discovered that the children were residing at Florence Bradley's home.   It was when he called them that he discovered that his wife had died.   Upon hearing about his wife's death he traveled to Augusta, Georgia, and tried to prove to the children that he had not abandoned them.  He reportedly expressed his desire to gain custody of the children, but he backed away from that because of the precarious nature of his circumstances.  He was on parole from New York, and had only gotten permission to travel out of state because his wife had passed.

According to Jackie, his father promised that he would return to get him, and for a long time he prayed that his father would in fact return for him but it never happened. He recalled an occasion when his father sent down two pairs of shoes, one pair for Alicia and one pair for Ronald, but there was none for him or Vivian.   In explaining that situation, Alicia remarked that after his visit he had sent a package for them for Christmas.  She said that the reason he did not send shoes for Jackie and Vivian was because he did not have their size.  However according to Alicia her father had called to inform her that he had also sent $600.00 which was to be used to buy additional items for all four of them, including clothes and toys for Christmas.   The children did not see a dime of that money, and when Alicia asked Florence about the money she denied receiving it.  Unfortunately young and impressionable Jackie was never informed of this and internalized feelings of abandonment and rejection by his father.

According to Ronald and Jackie, they started working at a young age to satisfy their needs.  At age 10 Jackie was working at Kong Wah's Restaurant where he washed dishes and swept the floor.  As Alicia puts it, "He was hardly tall enough to reach the sink, but the owners knew how hard it was for us and so they gave him the little job." From the measly earnings he tried to supplement his income by playing the lotto.  He

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

bought Cash 3 with the numbers '625' denoting the date of his mother's death.   He also bought the numbers '523', denoting his mother's birthday.  Jackie remembered that he was able to buy a TV and a Nintendo with money he earned from Kong Wah Restaurant but both were broken by Florence.    Ronald recalled that he did odd jobs such as raking yards, but, if he were able to save anything over $100.00, the money would be taken from him.

There was one bright light in Jackie's childhood after his mother passed and it was his neighbor, Junette Lampkins.  In an interview with Mrs. Lampkins she related that for a number of years she tried to be a surrogate mother for Jackie.  Mrs. Lampkins, who is a mother herself, lived across from the Bradley home.  While she would not go into details as to the neglect and abuse she observed, she does not feel Jackie was treated well. She had the impression that Jackie lived in an uncaring and unloving environment.  As a Christian woman, she said, she saw a need in Jackie and sought to fill it.    She recalled that for about five years, from when Jackie was seven until he was twelve years old, she bought clothes for him, she cooked meals for him and she gave him money for school. "He was such a sweet child," she recalled; "But he was slow in school; and so I would give him a dollar to do better."   She said that she would wash and iron his clothes so that he would not have to go to school with filthy clothes.   "I would have his snack waiting for him when he came home from school and I took him to church with me.  My church family looked out for him," she stated.

Mrs. Lampkins remembered Gussie Belle (Jackie's mother) as a church going woman who kept her children in the church.  "Their mother's death took a toll on him.  It affected all the children but it seemed that it affected Jackie the most.   He was the baby and I tried to pick up the pieces.  I reached out to him because he needed help." Jackie recalled how Mrs. Lampkins would hold him tight during Mother's Day services.  He remembered as well that Mrs. Lampkins even brought her grandkids over so that he would have other children to play with.  The help that Mrs. Lampkins gave to Jackie also benefited his siblings, and Ronald recalled that very often it was the food that Jackie

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

brought home that he would eat.   Alicia remembered that in addition to the Lampkins there were other neighbors who also looked out for them, because everybody in the community knew of the abuse and neglect.   But the Lampkins were the most dependable. She recalled that dinner was served only when Mr. Bradley ate, and if they were not in the house at the time, they got nothing.   Because Mrs. Lampkins was the closest neighbor and because she had such fondness for Jackie they would slip Jackie out and send him to Mrs. Lampkins, who never refused to send them a meal.

Jackie recalled that his aunt did not like the fact that he was spending time with the Lampkins.   "My aunt did everything that she could to keep me away from Mrs. Lampkins."   Despite the protests from his aunt, many nights he would sleep over at the Lampkins where he had his own room.    However, Mr. Bradley threatened to call the police and have Mrs. Lampkins arrested for harboring Jackie at her house.   Said Jackie: "That's when I stopped going to Mrs. Lampkins.   I didn't want her going to jail because of me."   Upon reflection, Jackie now feels his aunt and her husband were afraid of losing the funds that they were receiving for him.    Florence Bradley admits that Social Security benefits alone amounted to $847.00 every month.

It was after he stopped going to the Lampkins that Jackie began to get support from the guys in the street.   "The drug dealers took care of me after Ms. Lampkins" he remarked.    They saw that he was in dire need of attention.   He recalled that he used to run track and was good at football.   But he had to walk barefoot to school and to practice until a drug dealer bought him a pair of Nike shoes, which he wore for 4 years.   The drug dealer also bought him a bike so he could get back and forth from school.    Through their "kindness," the drug dealers and hustlers introduced Jackie to criminal behavior.

Jackie recalled that his participation in criminal activity started with the guys on the street asking him to be a lookout and alert them when the cops were coming around. They introduced him to the players on the street and taught him how "not to be a snitch." By the time he was 14 years old he began to deal, and by the time he was 15 years old

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

they showed him how to cut, cook and package the drugs.   Soon he was selling and making money to take care of his needs and the needs of his siblings.

Ronald attributed his brother's legal problems to the deprivation that they suffered as children.  He said that Jackie was a talented football player, and might have been able to get a break to go on to a better life.  According to Ronald, college football scouts were interested in Jackie, but his aunt did not offer him any encouragement or support.   Yet when Jackie began to get in trouble she would comment that no good would come of him.    Jackie recalled his aunt's words to him: "You son of a bitch.  You're not gonna live to see twenty one."   In an interview Florence was asked if there was anything she would have done differently in raising her nieces and nephews, to which she replied that she did the best she could.

Through sobs, Alicia remarked that she blames herself for the misfortune that befell her brother.  "I was the oldest and I should have looked out for them better," she said.    When asked, what could she have done, given that she was a minor herself, she stated that she could have stood up to her aunt more and talked out against the abuse and neglect.  She recalled that on two occasions, the Division of Family Services came to the house after being alerted by neighbors, but nothing came of it.  "They talked to my aunt and that was it," she remarked.    Alicia said that she tried to make up for that by being there for her siblings, and making sure that they would always have a place for them at her house.

Alicia related that she was 15 years old when she became pregnant, and though her aunt tried to kick her out, the authorities told her that she could not do so.  However, at age 17, Alicia moved into the home of her baby's father.  "I dropped out of school and got a job" she recalled.   Within months she was able to get a place of her own.  Though the younger ones were forced to remain with Florence, Alicia was able to provide a place of respite for her siblings.    It was at age 16 that Jackie moved out of his aunt's home.  By then Ronald had already gone.  According to Ronald, by the time he reached age 17

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

he had grown tired of the deprivation, the verbal and emotional abuse and tired of being 'robbed' of the meager earnings he was able to make on his own.    Additionally, given that she was now of legal age, Alicia had the checks transferred to her name over the objection of Florence.    Given the deprivation that they had suffered, Alicia made sure that they had liberal access to whatever funds they were entitled to.  Unfortunately, there was no guidance as to the best way the funds should be spent and so much of the money was wasted.

**Education History**

School records confirm that Florence Bradley was the custodial parent.  They indicate that at the time she obtained custody of the Walker children, she was residing first at 208 Truman Drive then later at 2014 Florida Road where the Bradley's continue to reside.  The records are revealing and show that Jackie had the ability to perform well academically when he received appropriate guidance and support.   On April 19, 1983, two months prior to his mother's death, he scored in the top 91% on the Metropolitan Pre-Reading skills.  However, by the time he was in grade two, his score on the Otis Lennon Standardized School Ability test placed him in the bottom 12%.  He failed Reading and Mathematics in grade 3 and had to repeat the grade.  He also repeated the fourth grade.

School records from Murphy Middle School show that he was doing well scoring in the 70's and 90's.   In grade 8 he scored 90's in Language Arts, Mathematics, Computer Literacy and Physical Education.   In grade 9 there was a slight drop in his grades and his scores ranged from the 50's to the 80's.   However by grade 10, he was failing in all areas.  He was present for only 55 days with 33 absences.    He related that for a while there was motivation to do work, and this was particularly so when he was being nurtured and encouraged by Mrs. Lampkins.  However, as time passed he became increasingly discouraged.  He cited the fungus on his skin and scalp that caused him embarrassment; the teasing that he was subjected to because he was so deprived.   He

PRE-SENTENCING REPORT
WALKER, Jackie Ray

became tired of the ragged clothes he was forced to wear, and holes in his shoes. He rarely had pencil and paper and he got tired of going to his friends' home, particularly after he stopped going to Ms. Lampkins.

Disappointing as well was the fact that because of the financial hardship he could not participate in sports as he would have liked to. He recalled that he was an excellent sprinter, and Alicia confirms that he has trophies from school to prove this. He was also very good in football, to the extent that had he continued to train and play he could have obtained college scholarships. After a while he became frustrated by the lack of concern and support. He recalled that he suffered frequent fainting spells and his coach required that he get tested. However his aunt failed to get him medical attention and the school could not risk having him compete in meets without knowing what was causing these fainting spells. He had no impetus to continue his education, and so he dropped out of school and engaged in hustling full time. He was able to assist his brother who went on to graduate from high school.

## Employment History

Jackie was only ten years old when he got his first job at Kong Wah's Restaurant. It was his way of earning some money so that he could take care of some very basic needs. A call to Kong's Restaurant, even though under new ownership confirmed that Jackie worked there many years ago when he was but a child. But before he started working at Kong Wah's he was being paid $25.00 every two weeks for helping the school custodian, Mr. Williams. He was doing this from when he was in the first grade. He would help to sweep the yard and empty the trash. The little money he earned he would share with his siblings who had to depend on the school lunch that was served. A review of his Social Security records shows that from 1995 he had formal employment whereby he paid into the Social Security System. However of note is that he also had jobs whereby he was paid 'off the book.' A breakdown of his earnings as provided by his Social Security is as follows:

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

- 1995:            Augusta Temporary Services, Martinez, GA - $157.18
- 1996 – 1997:  ADSI Moving Systems Inc. Augusta GA – $845.93 & $85.00
- 1997:            Kong Wah Chinese Restaurant, Augusta, GA - $242.25
- 1997 – 1998:  Insulation Supply Co. Inc, Augusta, GA - $4,061.16 & $3,732.15
- 2002:            Great Tires, INC, Augusta, GA - $4, 528.03
- 2002 – 2003:  Staff 2000 INC, Augusta, GA - $2,177.51 & $1,664.00
- 2003 – 2004:  Industrial Metal Finishing Inc., Augusta, GA - $11,631.54 & 3,311.66
- 2004:            Management Analysis & Utilization Inc., Augusta, GA: $3,395.00
- 2005:            Augusta Industrial Electrical Inc., Dearing, GA: $6,008.00
- 2005:            Monroe Services Inc. Augusta, GA: $106.75
- 2005:            Crest Industrial Services Inc., Augusta, GA: $2,580.00
- 2006:            Dressel Electrical Contracting Inc., Augusta, GA: $7,179.38
- 2007:            Earnings not yet in records

    As the above indicates, Jackie maintained steady employment when he was not incarcerated. Persons interviewed indicate that he was a hard worker who was willing to work hard to make a living.

## Criminal History

    The focus of this investigation is not on Jackie's criminal history as it is fully detailed in the PSR submitted by the government. Thus information about his criminal history is presented here within the context of the wider focus on Jackie's social history. Based on information from the government, Jackie has a history of convictions dating from 1994, when he was 17 years old. Information from the government indicates that Jackie's first conviction was on or about August 26, 1994, at age 17, for giving false information to a police officer, an offense that is classified as a misdemeanor. Based on information received from the government, the majority of his convictions are for

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

misdemeanors, and the majority of convictions are related to drug possession and/or DUI charges. These convictions seem in line with Jackie's admitted susceptibility to drugs and alcohol, substances which he says help him to get through emotional problems.    His criminal history record does not indicate a history of violent conduct or weapons possession, with the exception of the current charge.

## Medical / Mental Health History

Medical records provided by the University Hospital of Augusta Georgia, indicate that Jackie was 7 lbs 2 oz at birth.  Physician notes indicate that Jackie was placed in isolation at the time of birth and was diagnosed with jaundice.   It also noted that his mother was a smoker.   According to Jackie, the lack of proper care in childhood resulted in a number of medical problems for him.  He reported that he had regular skin and hair fungus because of the unhygienic conditions of the bathroom he and his siblings were forced to use.  This is confirmed by medical records indicating that he suffered oral herpes and skin rash.   He recalled that he was not provided with shoes and, in walking barefoot, he suffered a lot of cuts, which were not adequately taken care of and became infected.   He recalled that he had a splinter in his hand which started to 'grow' until a neighbor saw what was happening and reported it to his aunt.

Hospital records confirmed this incident, noting that on October 6, 1984, 7 year old Jackie was taken to the emergency room because of a splinter that had been at the base of his right thumb for about a month.   There were puss pockets under the skin between the thumb and the index finger where the splinter had entered.   An incision was made and a 2cm splinter was removed with forceps.   He reported that he was involved in a motor vehicle accident at 18 years old and suffered head injuries.   He has a noticeable scar above his eye resulting from the accident.   Records from University Medical Hospital did not refer to the accident, but a search of records at Medical College of Georgia, which is located adjacent to the University Hospital, has been initiated.

PRE-SENTENCING REPORT
WALKER, Jackie Ray

Other medical complaints indicated in the medical records show that he had been treated for neck strain, and swollen shoulder.  On April 26, 2004 he was taken to the emergency room complaining of abdominal cramping.  He was given a differential diagnosis of Gastritis peptic ulcer disease.  It noted that there may be a connection to his symptoms and the chemicals that are used at his job.  He was prescribed Phenergan and Donnatal.  Noteworthy is an admission to the Emergency Room on March 14, 2005.  The records indicate that he had fainted a day earlier and fell and fractured his jaw.  It noted that there was a history of 'blacking out.'  As mentioned earlier in this report, Jackie indicated that he has been suffering from 'black outs' from childhood, and recently had an episode at the MCC.  Though his tier mates were alarmed, he assured them that it was temporary and that he would be fine.  He said that though his aunt was advised to seek medical help for his condition it was never sought.

Jackie does not report a history of mental health diagnosis or treatment.  He reported, however, that events in his childhood affected him very badly.  He pointed to the death of his mother as especially devastating.  He also found devastating his abandonment by his father, and the harsh treatment that he received from his aunt and uncle.  He denies that he received counseling or mental health treatment, and suggested that he was too ashamed of his situation, and also too afraid of upsetting his aunt and uncle, to let school authorities know what was happening to him.

**Significant Relationships**

Jackie was 17 years old when he became involved with Tee-Era Warthen.  In an interview with Tee-era's mother, Jaquinta Collins, she related that she was not in favor of the relationship, as she knew that Jackie was involved in street activities.  Mrs. Collins said that after Jackie was arrested, she was relieved because that signaled the end of the relationship with her daughter.  However, during his incarceration, he began writing her and from the tone and content of the letters, she realized that what he needed was a mother figure.  "I adopted him when he was 17 and became his Godmother," Mrs.

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

Collins remarked. She said that as she got to know Jackie she saw in him a vulnerability that was exploited by others for whom he cared. She remarked that he was a hard worker and would give to others. Mrs. Collins remarked that he worked hard even when it was obvious he was being exploited because of his felony record. Even when he was paid less than fellow workers who did not have felony records, he would not complain. He continued to work hard, would make an extra effort while trying to find something better. She said that the car Jackie's brother drives is Jackie's but his brother would not even drive Jackie to work though they worked at the same place. Jackie could not drive because his license was suspended. "He desperately wanted to be loved and he felt he had to give his all in order to be accepted," Mrs. Collins said. She described Jackie as a kind, generous, wonderful young man whom she is pleased to have calling her 'Mom.'

Jackie is the father of two children. His first son, Makel Jackie Walker was born on December 8, 2003. The child's mother is Myra Wright. In an interview with Myra she stated that she met Jackie in 2002. At the time he was working at a welding company and she was working in retail. She was attracted to him because he was even tempered and kind. She said that she could not have asked for a more supportive partner and he was very good to her son and continues to keep up a relationship with her son. The relationship ended because he over extended himself too much, working excessive hours so that he could take care of his siblings, she said. After a while, she added, his dedication to helping his siblings placed too much strain on his relationship with her.

Jackie's second son is Khalil Jadeen Ronald Walker, born on October 16, 2004. Khalil's mother is Gloria Washington. Jackie became acquainted with Gloria when he visited his father in New York. At the time his father was living with Gloria's mother, Debra Washington. According to Gloria, she has known Ronald Sr. ever since she was a young child. She did not know that he had kids until they visited him in New York. She recalled a volatile relationship between her mother and Ronald Sr. She remembered that her mother and Ronald Sr. fought all the time. According to her, she had not seen or heard from Jackie for years after he once visited his father, but came upon his name while

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

doing a people search on the Internet.   He came up to visit her and talked her into moving down South where he said there were better opportunities and also better for her child.  They engaged in a brief affair and she became pregnant with his son.

Consistent with what others have said of Jackie, Gloria described him as very kind and good natured.  She said he was always willing to reach out and help, and so others took advantage of him.  She said that she had heard of the abuse he and his siblings suffered and she was appalled that their father did nothing to get them out of the situation.  She said that despite the abuse Jackie received, he was always the first to extend a helping hand, even to the "foul mouthed aunt who raised him."   He has been a great father figure to her daughter who recently graduated from middle school, she said.

Jackie is currently romantically involved with Dwayna Benning.  They have been dating on and off for five years and had been living together for three years.  She said that she has known Jackie since 1993, when she met him through her brother.   She said that she was attracted to Jackie because he had a good heart.  She said that he is like a father to her children.  "My daughter cares more about him than her own dad," she said, "he's the one who goes to her school, to PTA meetings, attends her school functions, and it was he who taught her how to ride a bike."  According to Dwayna, her daughter began to fail in school after Jackie was arrested, and it was not until he began to write to her that she began to do better.   She reiterated that Jackie has a good and loving heart.  She said that he will take all the kids to the park, including his nieces and nephews to play ball.

Dwayna pointed out that Jackie would go out of his way to get for others while depriving himself.  "He does not know how to say 'no'" she remarked.  She said that with all the jobs that he had and whatever hustling he had done on the streets, all he has for himself is six outfits and one pair of shoes.  "I got so tired of seeing him with the one pair of tennis shoes that I went out and got him a pair.  Then he asks me 'why did you waste money on me?'  He just feels that he has to sacrifice himself," she said.  "It's as though he can't be happy so he tries to make everyone around him happy."

18

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

Dwayna said Jackie impressed her as a hard worker, willing to do whatever it took to assist his family. She said that the only problem she has with Jackie is this sense of obligation that he feels for his siblings. She said that this had led to him being exploited by all three siblings who look to him to satisfy their needs. "Every time he gets into trouble is because they pressure him for something." Dwayna recalled that Jackie had to have his car in his sister's name but, if he did not give his sister what she wanted, she would threaten to take the car from him. Similar sentiments were expressed by Ms. Collins (referred to earlier) who said that even when Alicia (Jackie's sister) was living with a man, she depended on Jackie to pay her rent. According to Dwayna, if Jackie buys her a gift and his sister finds out about it, his sister demands a gift from her. When she points out to him that he is being used, his response is that his siblings are all he has because his parents are dead.

These feelings are echoed by Alicia who stated that there is a special bond that exists between the siblings which is difficult for an outsider to understand. "During all that suffering we went through as kids, all we had was each other. The only way we could survive was through each other." She said that speaking with this writer was the first time she had an opportunity to speak with a professional about the pain of childhood following her mother's death. She hopes that this will pave the way for all four of them to address the underlying anguish and pain in a healthy environment. "We need to do that so we can move on," she remarked, adding that she suffered a nervous breakdown because of all the pain that she has been carrying around.

Dwayna confirmed that Jackie's mother's death has had a profound impact on him. She said that for the five years that they have been together there is a period of the day when he just sits and cries. "I try to tell him not to be so depressed but I have learned to let him have his time." She pointed out that on their first date he took her to the cemetery where his mother is buried. He left her in the car while he went to kneel by his mother's grave to talk to her. She thought it strange that this should mark their first date,

19

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

but later discovered that it was a regular ritual for him. Jackie explained that he visits his mother's grave at least once per month. He said that he has not been able to find someone with whom he could talk to about the pain of losing his mother. Dwanya tells him to get over it, but it is something that he can't do.

She stated that despite Jackie's feelings of depression, he still manages to work hard and care for her and her children, as well as his two sons to whom he is devoted. She recalled that when he was out he advised her to stay home and take care of the kids. "The last time I worked was in 2003 until he got locked up." She now works at a plant in Columbia County. She said that despite the fact that Jackie is locked up, he sends the "little money he makes in jail" to help out. "I love him so much. He has such a good heart." Dwayna said that she hopes Jackie now recognizes that his family has no commitment to him. She wants Jackie to focus on taking care of himself and his life with her when he gets out. "As soon as he comes home we're gonna get married," she stated.

**Current Functioning**

Jackie has several tattoos on his arm and neck that speaks to the pain he has been carrying. The first tattoo he ever received was one that said 'In memory of Mom.' On his right forearm he has five graveyards, depicting five friends who have died. There is a tattoo of praying hands, representing his mother and father. A cross on his shoulder with the words, 'Lord Knows' is another tattoo for his mother which implies that 'Only God knows' the tribulations her children have seen. There is another with a smiling face and a crying face which says 'Laugh now and cry later' but which should actually have read 'Cry now and laugh later' to depict the pain of childhood but the hope that there will be joy in the future.

Jackie remarked that this period of incarceration has been good for him because it has provided him with the opportunity to talk about the pain of his mother's death, without being chided for it. Additionally he has "gotten saved," and attends religious

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

services on a regular basis.   He participates in the GED program, and hopes to earn his GED.  Consistent with his work ethic, he has been employed as an Inmate Companion. Records from the BOP confirm that he attended inmate companion training which he completed on March 24, 2008.   An evaluation dated July 8, 2008 indicate that he scored 'outstanding' in seven out of nine areas and 'good' in the remaining two.   In the areas of quality and quantity of work, it noted that he did superior work and 'drives self exceptionally hard at all times'. [See attached]   For the period March 8 – June 8, he worked a total of 264 hours for a total pay of $259.25, much of which was sent home to Dwayna Benning.   A pre-trial review report dated 7/10/08 indicated that Walker is a very good worker and has maintained clear conduct.

His work on the tier in suicide watch has also afforded him the chance to interact with and make a positive contribution to the well being of his fellow inmates.   This has also allowed him to earn a decent income behind the prison walls, most of which he sends home for his children.   He also participates in the drug awareness program and has a keener understanding of the effects that drugs have not only on himself but also on his community.  Having that understanding "has really changed me," he remarked.   A memorandum from Gibbon Douglas, drug treatment specialist, dated, July 30, 2008 stated that, "Mr. Walker actively participated in group discussions, and had excellent attendance."

**Mitigation Factors**

In reviewing Jackie's social history, the following mitigation factors emerge:

- **Emotional Impairment**

At age six, Jackie suffered significant emotional trauma, stemming from the tragic death of his mother.   This event was a moment of rupture in Jackie's life, not only with regard to the loss of attachment with his mother, but also with regard to

21

PRE-SENTENCING REPORT
WALKER, Jackie Ray

feelings of self-loss.    Jackie experienced his personal development in relation to
the life-sharing attachment he had with his mother (e.g. she took him everywhere
with her because he was the 'baby'), and when that tragic rupture in the
relationship occurred, Jackie's response indicates a lost sense of his own evolving
identity and worth.    Feelings of guilt (that he was somehow responsible for his
mother's death), as well as feelings of rage, failure, and depression would have
likely underscored Jackie's trauma.    The fact that his childhood circumstances
did not allow him to give expression to his feelings or to get treatment, even as he
had to live in the same home as the person deemed responsible for his mother's
death, increased the risk of long term emotional vulnerability and impairment.
Of note, for instance, is Jackie's compulsive obligation to his siblings that presses
him to put his own interest and needs at risk for the financial benefit of his
siblings.    This behavior is no accident, given feelings of guilt or self-blame and
depression Jackie apparently felt since his mother's death, which would extend to
his blaming himself for the fact that life became worse not only for him but also
for his siblings.    While Jackie gives and gives in to his siblings, he learned to
respond to his loss through passive or submissive forms of expression such as
mourning, tattoos, self-deprivation, trying to please others or working to please
others, and drug and alcohol use.  Jackie's emotional vulnerability impresses as
likely to have contributed to an impairment of capacity in decision making and
judgment, resulting in actions that have had legal consequences.

- **Abuse and Neglect**

Abuse and neglect are significant risk factors to a child's welfare and
development.  Children exposed to abuse and neglect face increased risk of
physical, psychological/emotional, and social problems.  Unfortunately, the risk
associated with abuse and neglect can include increased susceptibility to
delinquency.  In Jackie's case, for instance, the maltreatment was so

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

extraordinarily harsh that it precipitated early exposure to life on the streets and early impressionability to illegal activity.

- **Abandonment by Father**

    Father abandonment is another factor that can put a child's development at risk. Jackie interpreted his father's abandonment as rejection and another event that made him feel vulnerable, particularly after his mother's death. Associated with his father loss was also the lack of a positive male role model in his life. His earliest impressions of male identity and role playing were the negative examples of his father and his aunt's husband. Along with the emotional discord such impressions engendered in Jackie, there was the increased risk of learning responses that, while available, were inappropriate to his developmental needs.

- **Environmental Press**

    Jackie grew up in an environment wherein he had early exposure to alcohol use, drug use and drug dealing, violence, and other criminal activity at an early age. Such factors were harsh external pressures compounding the internal pressures he was experiencing at home. Given the age (10) that Jackie started fending for himself on the streets, he would have been extremely vulnerable to the influence of drug dealers and hustlers.

- **History of Employment**

    Jackie has a history of employment, which indicates a capacity to be a productive member of society.    The harsh conditions under which Jackie was raised forced him to start working at age 10.    Those harsh conditions, coupled with his sense of loss and deprivation, also made him vulnerable since to impressions of illicit street activity as a means to supplement his income. In adult life, emotional,

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

academic, and legal issues seem to have limited Jackie's capacity to have a more impressive employment record. However, his employment record suggests an inclination to attain some level of formal employment on a regular basis.

- **Family Ties**

The ties between Jackie and his children as well as the relationship he shares with his partner Dwayna Benning play a significant role in his life. These ties have been of emotional and material benefit to his children as well as to his "step-children." As noted, Jackie's care and generosity are not limited to his biological children (ages 5 and 4), but also to the other children of the women with whom he has had a relationship. Given Jackie's emotional conflicts regarding his own upbringing, his efforts to maintain close ties with his children, and thus break the cycle of abuse and neglect, might be deemed extraordinary.

- **Acceptance of Responsibility**

In pleading guilty, Jackie has indicated acceptance of responsibility. It seems, based on records received from the government, that Jackie showed a willingness to cooperate with the authorities following his arrest.

## Conclusion

Jackie's development was traumatized at an early age with the death of his mother. He was six years old at the time of his mother's death, the youngest of the four children born to his mother, and the most emotionally dependent on her. For Jackie, the loss of his mother was experienced as an extremely damaging blow, relived over and over in his memory, and which has persisted in its influence over his adult life. Other factors in Jackie's life added to and underscored the trauma. These include the abandonment by his father, which took on greater significance after Jackie's mother died.

24

**PRE-SENTENCING REPORT**
**WALKER, Jackie Ray**

Of significance, too, was the extraordinary condition of abuse and neglect he suffered in the custody of his aunt and her husband. This abuse and neglect precipitated early exposure to the streets and to the related influence of drugs, and other criminal activity. The harsh conditions under which Jackie was raised acted to perpetuate and extend a sense of trauma throughout his life, contributing to choices and actions that have had legal consequences.

The mitigating factors presented also include factors in Jackie's character that can lead to rehabilitation and productive restoration to society. Of note is Jackie's employment history, which, given the circumstances of his life, allows him a feeling of pride and possibility. Another positive is the close ties he has with his children. Jackie seeks to foster an attachment to his children that he feels was denied him by his father. Jackie's relationship with Dwayna Benning also has been positive for him. It is a supportive relationship, whereby she has sought to encourage him to move beyond the trauma that has impaired his life since childhood. She has expressed commitment to Jackie and to be supportive of him. Jackie has been like a father to Dwayna's daughter, and has been supportive of both Dwayna and her daughter. This family relationship seems a potential alternative to the stressful relationship Jackie has with his siblings, whereby he feels pressured to sacrifice his own needs and interest in order to satisfy theirs' financially. This is a factor that seems to have contributed to his susceptibility to illegal activity as a source of income.

Despite his criminal history, reports from family members and others indicate that Jackie's temperament is not that of a hardened individual. He is described as kind, and even tempered, with a good heart. The majority of his convictions are for misdemeanor charges. He admits that drug use has been a problem, which has contributed to most of his convictions. He does not have a criminal history of violence or gun/weapons related offenses. As Jackie recalls the instant offense, he seems close to tears and states that he is happy the guns he had in the car ended up in the hands of the police and not in criminal hands. Family members, the mothers of his children, and Dwayna Benning, with whom

**PRE-SENTENCE REPORT**
**WALKER, Jackie Ray**

he has lived for four years, do not fear him or see him as fearsome to others.     They do recognize his emotional vulnerability.  They see someone who still mourns and cries over the death of his mother, and they see someone whose vulnerability can be taken advantage of or exploited.

Jackie has taken responsibility for his actions.  But it is difficult to divorce his actions from the vulnerability associated with events in his life since early childhood. The process of interviewing Jackie for this report has allowed him to talk about his mother's death, and other issues, in a way that has helped him to start understanding his life.   It is hoped that he will have opportunity to continue the process of understanding through supportive therapy and rehabilitation programs.   At MCC, he has been assisting in watching inmates who are on suicide watch.  He has also been attending to religious activity such as Bible reading.  Participation in the suicide watch program and in religious activity, he said, has allowed him to help other inmates and also to start addressing his own issues.  He does not make excuses for his actions, but he now sees the importance of understanding his actions within the context of his entire life.  It is hoped that the Court will consider the mitigating factors presented, keeping in mind that, although the Court may be guided in its decision by the US Sentencing Guidelines, the Court also has the discretion to depart or vary from those Guidelines when imposing a sentence.

Respectfully submitted,

Carmeta Albarus-Lindo, MSW; LCSW-R
(Forensic Social Work Consultant)

26



# United States Department of Justice

## Federal Bureau of Prisons

*has satisfactorily completed the*

requirements for

**POSITIVE LIFE-STYLE**

and is hereby awarded this

# JACKIE WALKER

## Certificate of Achievement

D. A. P. Coordinator

Date 8-12-08

Drug Treatment Specialist

© 1998 GOES 2911
All Rights Reserved

LITHO. IN U.S.A.

# Metropolitan Correctional Center

New York, New York

## *Jackie Walker*

has satisfactorily completed

INMATE   COMPANION   TRAINING

and is hereby awarded this

*Certificate of Achievement in Suicide Prevention*

On March 24, 2008

Cristina Liberati, Ph.D.
Acting Chief Psychologist

James N. Cross
Warden

Darlene S. Imeri, Psy.D.
Staff Psychologist and Coordinator

BP-S324.052 **WORK PERFORMANCE RATING - INMATE** CDFRM
OCT 98
U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| Inmate's Name Jackie Walker | Register No. 60623-054 | Unit 5S |
|---|---|---|
| Evaluation Period 3/08 to 6/08 | Work Assignment INMATE COMPANION | |

Ms. Dennis is an inmate companion in the Suicide Watch Program.  She has been an inmate companion since April of 2004.  Her responsibilities include watching female inmates who are on suicide watch, actively listening to inmates on suicide watch and summoning help when necessary.

Signature and Date of Dept. Head Approval

---

Route to Dept. Head for Review, Then to Unit Team

---

Instructions: Circle the best statement in each area.  Base your rating on the inmate's overall performance for the rating period--neither the inmate's best day nor worst day--as compared to what is expected of a satisfactory worker in the assignment.

A. QUALITY OF WORK
   1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
   2. Fair. Careless; makes mistakes and does not check work. Should do better work.
   3. Satisfactory. Makes some mistakes but no more than expected at this level.
   4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
   5. Outstanding. Does superior work

B. QUANTITY OF WORK
   1. Unsatisfactory. Lazy, wastes time, goofs off.
   2. Fair. Does just enough to get by. Has to be prodded occasionally.
   3. Satisfactory. Works steadily but does not push self.
   4. Good. Willing Worker. Does a full day's work and wastes little time.
   5. Outstanding. Drives self exceptionally hard all the time.

C. INITIATIVE
   1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
   2. Fair. Usually relies on others to say what needs to be done.
   3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
   4. Good. Can plan own work well. Acts on own in most things.  Doesn't wait to be told what to do.
   5. Outstanding. Has good ideas on better ways of doing things.

D. INTEREST; EAGERNESS TO LEARN
   1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
   2. Fair. Shows minimal interest but not very eager to learn.
   3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
   4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
   5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things that will improve knowledge.

E. ABILITY TO LEARN
   1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction unable to learn, no matter how hard trying.
   2. Fair. Slow but if tries eventually will pick up the skills. Needs more instructions than most.
   3. Average. No slower and no faster to learn than most inmates.  Requires average amount of instruction.
   4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
   5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

F. NEED FOR SUPERVISION; DEPENDABILITY; SAFETY; CARE OF EQUIPMENT
   1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
   2. Needs closer supervision than most. Not very dependable.
   3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
   4. Needs little supervision. Good record of dependability an promptness.
   5. No supervision required. Completely dependable in all things.

(This form may be replicated via WP)                          Replaces BP-S324, OCT 94

G. RESPONSE TO SUPERVISION AND INSTRUCTION
    1. Poor. Resentful and hostile. May argue with supervisor.
    2. Fair. Resists or ignores suggestions.
    3. Satisfactory. Generally does what is told without any fuss.
    4. Good. No hostility or resentment. Tries to improve.
    5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

H: ABILITY TO WORK WITH OTHERS
    1. Poor. Negativistic, hostile, annoying to others.
    2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
    3. Satisfactory. Gets along OK with most co-workers and is accepted by them.
    4. Good. Friendly, congenial, helpful; others like to work with.
    5. Outstanding. Gets along well with everyone. Very popular.

I. OVERALL JOB PROFICIENCY
    Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:

    1. Fire or lay off that individual?
    2. Transfer the person to a less demanding job at a lower pay scale?
    3. Continue to employ the person but without a raise or promotion this time?
    4. Raise the person's pay but keep the person at the same job?
    5. Promote the person to a more demanding job at a higher pay rate?

J. GRADES AND PAY
    1. Performance Pay - Grade Class (Circle one) 1 - 2 - 3 - 4 - M - (S.)

    2. Hours of Satisfactory work _____264_____ .

    3. Regular Pay ____$259.25_____ .

    4. Bonus Recommended:__ yes; ___ no; _X_ N/A

    5. Total Pay _____$259.25_____ .

| Supervisor's Signature | Date 7/08/08 |
|---|---|
| Inmate's Signature _Jackie Walker_ | Date 7-08-08 |

Inmate _____ was requested to sign this rating, but refused, citing the following reason:

| Staff Witness' Signature | Date |
|---|---|

BP-S561.073  **PRE-TRIAL INMATE REVIEW REPORT**  CDFRM
DEC 94

**U.S. DEPARTMENT OF JUSTICE**                          **FEDERAL BUREAU OF PRISONS**

| MCC New York | | 5South |
|---|---|---|
| Institution | | Unit |

| Walker Jackie | 60623-054 | 7-10-2008 |
|---|---|---|
| 1.    Name | 2. Reg. No. | 3. Date |

4. Initial Pre-Trial Review Date                    Yes
                                        5. Inmate Present (Yes/No)
Reported from work foremen that Walker is a very good worker. Has maintained clear
conduct.

6. Key Indicators/Considerations: The following items were considered or reviewed during
   your Pre-Trial Review.

| Separation Needs | NO | Media Interest | YES |
|---|---|---|---|
| Work | 5 S.Orderly/ Suicide employee | Counseling | AS NEEDED |
| Quarters | 5 North | Detainers | NO |
| Intake Screening & other Pre-trial notification forms | COMPLETED | Behavioral Adjustment Custody | INC# none/IN |
| Education/VT | NEEDS | Mental/Physical Health | good/good |
| Religious Programming | Protestant | Visiting | ACTIVE |
| Recreation | PART | Bail Status | none |
| Court Status | A- Hld | | |

7. Next Court Date:  7-29-08              8. Asst U.S. Atty:  Adam S. Hickey

9. Team Comments: (To include changes in present status)


Positive Lifestyle, Recreation (roof), Unit base programs, leisure activities, participate
in a work program.


10. Signatures:                     Date of next review:  1-6-2009

_____            X _Jackie Walker_         7-10-2008  JP.
   Team Chairperson                    Inmate                 Date

cc: Inmate    R. Proto, CSW         407 AND 408 REVIEWED/CURRENT

File                                _Emg. Contact._

(THIS FORM MAY BE REPLICATED VIA WP)   DwayAA Benning

                                    706-306-1486

**United States Government**
**MEMORANDUM**

**DATE:**    July 30, 2008

**REPLY TO**    Gibbon Douglas
**ATTN OF:**    Drug Treatment Specialist

**SUBJECT:**    Walker, Jackie 60623-054

**TO:**    Central File

This is to confirm that Jackie Walker has successfully completed the Positive Life-style Program. The Positive Life-style Program teaches inmates how to examine their present behavioral patterns and how changes can bring about better results. Common topics include substance abuse, interpersonal skill building, parenting, errors in thinking, post release survival, and anger management. Mr. Walker actively participated in group discussions, and had excellent attendance.

# EXHIBIT B



RESEARCH SERIES ON THE RECIDIVISM OF
FEDERAL GUIDELINE OFFENDERS

RELEASE 1

# MEASURING RECIDIVISM:
# THE CRIMINAL HISTORY COMPUTATION
# OF THE FEDERAL SENTENCING GUIDELINES

A COMPONENT OF THE
FIFTEEN YEAR REPORT
ON THE U.S. SENTENCING COMMISSION'S
LEGISLATIVE MANDATE



May 2004

RUBEN CASTILLO
*Vice Chair*

WILLIAM K. SESSIONS, III
*Vice Chair*

JOHN R. STEER
*Vice Chair*

RICARDO H. HINOJOSA
*Commissioner*

MICHAEL E. HOROWITZ
*Commissioner*

MICHAEL E. O'NEILL
*Commissioner*

EDWARD F. REILLY, JR.
*(Ex officio)*

DEBORAH J. RHODES
*(Ex officio)*

**Commission Staff**

Linda Drazga Maxfield
Miles Harer*
Timothy Drisko
Christine Kitchens
Sara Meacham

*while serving at the U.S. Sentencing Commission

Exhibit 10

**Primary Definition Recidivism Rates[1] for General Demographic Variables, by Criminal History Category**
**Employment, Education, Marital Status, and Illicit Drug Use**
Recidivism Study 2003

|  | Total Percent Recidivating | CRIMINAL HISTORY CATEGORIES | | | | | |
|---|---|---|---|---|---|---|---|
| Demographic Characteristics | | Category I Percent Recidivating | Category II Percent Recidivating | Category III Percent Recidivating | Category IV Percent Recidivating | Category V Percent Recidivating | Category VI Percent Recidivating |
| TOTAL[2] | 24,335 | 15,429 | 2,857 | 2,844 | 1,359 | 779 | 1,067 |
| **Employment Status[3]** | | | | | | | |
| Unemployed | 32.4 | 20.6 | 26.8 | 39.4 | 48.0 | 53.0 | 54.5 |
| Employed | 19.6 | 12.7 | 23.3 | 32.1 | 43.1 | 50.8 | 55.7 |
| **Educational Attainment[4]** | | | | | | | |
| Less Than High School | 31.4 | 21.3 | 31.3 | 38.5 | 49.8 | 50.9 | 59.5 |
| High School | 19.3 | 10.6 | 21.8 | 32.5 | 40.1 | 53.5 | 52.6 |
| Some College | 18.0 | 13.9 | 17.8 | 29.0 | 39.0 | 45.6 | 50.0 |
| College Graduate | 8.8 | 7.1 | 6.5 | 18.5 | 34.6 | 73.3 | 36.5‡ |
| **Marital Status** | | | | | | | |
| Never Married | 32.3 | 22.7 | 32.3 | 44.6 | 46.9 | 56.8 | 57.9 |
| Legal Marriage | 13.8 | 9.8 | 13.9 | 25.1 | 40.0 | 41.3 | 52.7 |
| Divorced | 19.5 | 9.8 | 23.3 | 27.2 | 44.0 | 40.1 | 51.1 |
| Other[5] | 22.9 | 12.9 | 23.1 | 31.4 | 45.1 | 62.0 | 55.7 |
| **Illicit Drug Use[6]** | | | | | | | |
| No Illicit Drug Use | 17.4 | 10.8 | 21.2 | 31.5 | 40.2 | 53.5 | 53.7 |
| Illicit Drug Use | 31.0 | 21.9 | 27.5 | 37.6 | 49.6 | 49.8 | 56.7 |

[1] Primary recidivism definition based on offender's re-arrest, including supervised release/ probation violations, re-arrest, or re-conviction.
[2] Number of offenders with a 24 month period at risk of recidivating following either initiation of probation (for offenders receiving probation-only sentences) or release from confinement (for those offenders receiving confinement sentences).
[3] Employment status during the year prior to the instant offense. "Employed" includes alternative forms of employment and "Unemployed" includes missing values.
[4] Educational Attainment at the time of the instant offense.
[5] "Other" marital status category includes "Co-habitating," "Widowed," and "Separated."
[6] Illicit drug use during the year prior to the instant offense. Missing values counted as "No illicit drug use."
‡ Indicates fewer than 10 sample subjects. Findings may not be statistically significant.

Exhibit 9

## Primary Definition Recidivism Rates[1] for General Demographic Variables, by Criminal History Category
### Gender, Age at Sentencing, and Race
Recidivism Study 2003

CRIMINAL HISTORY CATEGORIES

| Demographic Characteristics | Total Percent Recidivating | Category I Percent Recidivating | Category II Percent Recidivating | Category III Percent Recidivating | Category IV Percent Recidivating | Category V Percent Recidivating | Category VI Percent Recidivating |
|---|---|---|---|---|---|---|---|
| TOTAL[2] | 24,335 | 15,429 | 2,857 | 2,844 | 1,359 | 779 | 1,067 |
| **Gender** | | | | | | | |
| Female | 13.7 | 10.0 | 23.6 | 30.7 | 40.0 | 36.8 | 39.0 |
| Male | 24.3 | 15.2 | 24.1 | 34.7 | 45.0 | 52.8 | 56.3 |
| **Age at Sentence** | | | | | | | |
| Under 21 | 35.5 | 29.5 | 35.6 | 54.7 | 64.3 | 60.1 | 55.0 |
| 21 – 25 | 31.9 | 22.3 | 29.1 | 42.7 | 55.1 | 70.1 | 68.1 |
| 26 – 30 | 23.7 | 13.3 | 27.3 | 33.6 | 43.9 | 53.1 | 58.8 |
| 31 – 35 | 23.8 | 14.6 | 22.7 | 32.7 | 42.7 | 50.8 | 59.3 |
| 36 to 40 | 19.7 | 12.1 | 23.2 | 29.4 | 33.1 | 40.0 | 51.3 |
| 41 to 50 | 12.7 | 6.9 | 13.3 | 24.5 | 45.3 | 35.7 | 41.3 |
| Over 50 | 9.5 | 6.2 | 13.9 | 19.8 | 21.0 | 57.1 | 41.1 |
| **Race** | | | | | | | |
| White | 16.0 | 8.9 | 18.9 | 27.8 | 42.8 | 46.8 | 50.9 |
| Hispanic | 24.3 | 18.9 | 22.9 | 36.0 | 28.1 | 47.0 | 57.8 |
| Black | 32.8 | 23.7 | 31.4 | 41.6 | 48.0 | 55.6 | 60.7 |
| Other[3] | 26.4 | 15.5 | 35.9 | 58.3 | 39.6 | 100.0‡ | 57.1 |

[1] Primary recidivism definition based on offender's re-arrest, including supervised release/ probation violations, re-arrest, or re-conviction.
[2] Number of offenders with a 24 month period at risk of recidivating following either initiation of probation (for offenders receiving probation-only sentences) or release from confinement (for those offenders receiving confinement sentences).
[3] "Other" race category includes Native Americans and Asians.
† Indicates fewer than 10 sample subjects. Findings may not be statistically significant.
‡ Indicates not statistically significant.
SOURCE: U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.